Osgood and others *against* Franklin and others.

Franklin and others *against* Osgood and others.

1816.

Osgood
v.
Franklin

If executors, empowered to sell the real estate of the testator, are vested with a legal or equitable *interest* in the estate, or are charged with a *trust,* the execution of which depends on the sale, the power survives.

Mere *inadequacy of price* is not a sufficient ground for setting aside a sale, unless the inadequacy be so gross and palpable, as, of itself, to afford evidence of actual fraud.

A trustee is not chargeable with more than he has received of the trust estate, unless there is evidence of very gross negligence, amounting to wilful default.

If the probate of a will be taken out, before the hearing of a cause, it is sufficient to support the plaintiff's demand; no objection having been made to the want of it, by pleading.

Where some of the plaintiffs became insolvent, and on a bill of revivor, their assignees were made defendants, and it was objected at the hearing, that they ought to have been made plaintiffs, it was held, that they could not be made plaintiffs against their consent, and having answered as defendants, the Court might infer their refusal to be plaintiffs, and being before the Court as parties, it was sufficient.

THESE were *original* and *cross* suits. The original bill was filed in *November,* 1808, by *Samuel Osgood,* and *Mary* his wife, she being the sole surviving executrix of *the last will and testament of *Walter Franklin,* deceased, her former husband, against the executors of *Samuel Franklin,* deceased, the executors of *John Franklin,* deceased, the executors of *Thomas Franklin,* deceased, and the residuary legatees of the testator.

*September* 29th.
*October* 2d, 3d,
4th, 5th, 1815,
and *January*
15th, 1816.

[ * 2 ]

1816.

Osgood
v.
Franklin.

*Walter Franklin*, being possessed of a large real and personal estate, on the 21st of *February*, 1778, made his will, and, after some specific legacies, devised the residue of his estate as follows: *one eighth* part thereof was directed to be put out at interest, and the interest thereon he gave to his sister, *Sarah Corsa*, for her life, and after her decease the principal and interest to her daughter, *Mary Corsa; one eighth* to the use of his sister, *Mary Wistar*, for life, and after her death, to her four children, *Thomas, Catharine, Sarah,* and *Mary,* (defendants;) *one eighth* part to his daughter *Maria,* (now the wife of *De Witt Clinton;*) and one eighth part to his daughter *Sarah,* (the wife of *John L. Norton;*) and to each of his three brothers, *John, Thomas,* and *Samuel,* he gave one eighth; and appointed his wife *Mary,* and his brothers, *John, Thomas,* and *Samuel,* executors of his will, upon the express condition and proviso, that if they owed him, the testator, any debts at the time of his decease, the same should be paid for the general benefit of his estate; and if they did not act on that condition, they were not to be executors. The will also contained the following clauses: "I give to my executors that may act, and to the major part of them, their heirs or executors, full power to sell, and to assign and convey away, any or all my houses, lands and tenements, and that forever, that are not already given away in this will foregoing." "I order that the money and effects be distributed and divided from time to time, as it can be raised from my debts and estates, by my executors hereafter named; but they are to be careful to keep a sufficiency undivided, to pay off all legacies as they become due, and to keep the estate as much on interest, or *rents, as they can, for the general benefit, and to be careful to take such securities for the money as they think is certainly good, by mortgages or personal securities, some security to be taken to every single person's bond." The testator died on the 1st of *August,* 1780. The will was proved in 1780, and letters testamentary granted to *John* and *Samuel,* who acted as executors; *Thomas,* the other executor named, declining to act

[ *3 ]

The bill charged that from the death of the testator, *John* and *Samuel* were the only acting executors, as long as they lived, respectively, and had the sole possession, management, and disposition of the estate, and collected and took into their hands large parts of the personal estate, and sold parts of the real estate, and employed the moneys received by them in trade. That *John Franklin* died in *September,* 1801, and *Samuel,* afterwards, continued sole acting executor until he died in *September,* 1807. That *John, Samuel,* and *Thomas,* were jointly indebted to the testator, at the time of his death

8

in a large sum, which was still unpaid; and that *John* and
*Thomas*, separately, were indebted to the testator in large
sums, which were still unpaid. That the plaintiff *Mary*, the
wife of the testator, married the plaintiff *Samuel Osgood*, on
the 24th of *May*, 1786.

That, after the death of *Samuel Franklin*, the plaintiffs,
*Samuel Osgood*, in right of his wife, and *Mary Osgood*, un-
dertook the execution of the will of the testator, and the ad-
ministration of the unsettled estate. That all the specific
legacies were paid, and the debts discharged; that *John
Franklin* and *Samuel Franklin* were, at the time of their
deaths, respectively, largely indebted to the estate of the
testator, for moneys and property received by them as exec-
utors, and which debts were still unpaid. That the plain-
tiffs had endeavored to collect and convert into money all
the remaining property and estate of the testator, *in order
to make a final distribution and settlement thereof. That
the plaintiffs, as sole acting and surviving executors of the
testator, had sold, in *June*, 1808, all the residue of the real
estate not before disposed of or wasted, for the sum of 25,000
dollars, which they had received; which sum, and 347 dol-
lars, due to the estate, are all they had received from the
estate, and, excepting the debts before stated and unpaid,
all they had knowledge of, or expected would be recovered
or obtained from the estate; that *Thomas Franklin*, who
never acted, and who was deceased, by his will, made
his two sons, *Walter Franklin* and *Thomas R. Franklin*, and
*Samuel Pleasants*, his son-in-law, his executors, (defendants,)
to whom he gave all his estate; that *Abraham* and *John Frank-
lin*, sons of *Samuel Franklin*, and executors of his will, were
insolvents; and that some of the executors of *John Frank-
lin*, who were his sons, *Thomas*, *Anthony*, and *Walter Frank-
lin*, and his son-in-law, *John Townsend*, were also insolvent.

[ * 4 ]

The bill called for an account and payment from the ex-
ecutors of *John*, *Samuel*, and *Thomas Franklin*, respectively,
and for a discovery, and that the residue of the estate might
be distributed so that the plaintiffs might be protected; and
that if the sums due from the executors of *Samuel*, *John*, and
*Thomas Franklin*, respectively, or either of them, should be
found to exceed the share due to each out of the residuary
estate of the testator *W. F.*, the balance might be paid to
the plaintiffs, &c.

The *answer* of the executors of *Samuel Franklin* admitted
the facts stated in the bill, except that they alleged that the
sale and conveyance of the residue of the real estate by the
plaintiffs was not valid, because the plaintiffs had no power
to sell, and that the lands sold were of much greater value
than the sum for which they were sold; and they annexed

1816.

Osgood
v.
Franklin.

[*5]

to their answer schedules and statements of all the acts and accounts of *Samuel Franklin*, as acting *executor of the testator *W. F.*, which admitted that their testator *S. F.* employed the money in his hands as executor, in his own business, and for which interest was charged, leaving a balance of 900 dollars; and the schedules also admitted a balance of 13,000 dollars from *Samuel* and *John*, as executors of *W. F.*, and of 6000 dollars from *Samuel*, acting as sole executor.

The answer of the executors of *John Franklin* admitted most of the facts charged in the bill; but stated that they did not know whether their testator was indebted jointly or separately, or not; nor whether he was separately indebted, or had any moneys in his hands, at the time of his death, belonging to the estate of *W. F.* They alleged, that the sale of the residue of the real estate of *W. F.* by the plaintiffs *Samuel Osgood*, and *Mary* his wife, to *John L. Norton* and *De Witt Clinton*, was fraudulent, having been made collusively, and for an inadequate price.

The *answer* of the executors of *Thomas Franklin* also admitted most of the facts charged in the bill; but stated that they knew nothing of any debt due from *T. F.*, their testator, jointly with *S. F.*, to *Walter Franklin*; and that the separate debt of their testator to *W. F.* had been fully paid and discharged. They alleged, that the sale of the residue of the real estate of *W. F.* by the plaintiffs, was void for want of power, and for inadequacy of price.

The answer of *De Witt Clinton*, and *Maria* his wife, and of *John L. Norton*, and *Sarah* his wife, admitted, in substance, the facts charged in the bill.

The other defendants, in their answer, admitted the facts charged in the bill, except that they were ignorant of the debts charged to be due to the estate of *W. F.*, and of the acts of *S. F.* and *John F.*, the acting executors; and they objected that the sale of the residue of the real estate by the plaintiffs, was void for want of power, and for inadequacy of price.

General replications were filed to the answers.

[*6]

*Pending the suit, *Samuel Osgood* died, and *Mary Osgood*, his wife, afterwards died, and the suit was afterwards revived by, and in the names of, the present plaintiffs, as proper parties.

The *cross bill* was filed on the 7th of *June*, 1809, (most of the plaintiffs being the defendants in the original suit,) against *Samuel Osgood*, and *Mary* his wife, *De Witt Clinton*, and *Maria* his wife, and *John L. Norton*, and *Sarah* his wife. It set forth the will of the testator *W. F.*, which contained a power to the executors to sell, as follows: " I give to my executors, *that they may act*, and to the major part of them, their heirs or executors, full power to sell,"

&c., (a) and gave to each of his executors who should act, the sum of 200 pounds, in lieu of all commissions, &c. for executing his will. After stating several facts, as in the original suit, the bill further stated, that the residue of the real estate of *W. F.*, which remained unsold at the time of the decease of *Samuel Franklin,* acting executor, consisted of the following tracts, viz. about 3,800 acres of land, on the southerly side of the *Mohawk* river, in all or one of the counties of *Otsego, Schoharie* and *Montgomery;* 4,000 acres of land in the same counties; about 4,600, in one or all of the same counties; a tract of land on or near lake *George,* the quantity of which was unknown to the plaintiffs; 850 acres in *Queensberry,* in *Washington* county; 12 lots of land on the *Susquehannah* river; a tract of about 5,000 acres on or near *Hillsborough,* in the state of *Vermont;* another tract, of about 5,000 acres, in or near *Reading,* in *Vermont;* a tract of 1,000 acres, in or near *Holton,* in the same state; *nine* rights in the township of *Cavendish,* in the same state; *and *fourteen* rights in the township of *Draper,* in the same state; and that there were, as they believed, various other tracts of land, belonging to the estate of *W. F.,* but which they were unable to particularize, the deeds, papers, &c., being in the hands of the defendants, or some of them. That the tracts of land referred to, at a fair valuation, were worth 200,000 dollars, and that sum could have been obtained for them, if reasonable pains had been taken for the disposal thereof. That *Mary Osgood,* as surviving executrix, had no power to sell the real estate; but if she had power, the sale ought not to be carried into effect, because the plaintiffs alleged that *Samuel Osgood,* and *Mary* his wife, *John L. Norton,* and *De Witt Clinton,* well knew the value of the said residuary estate, and corruptly and collusively agreed among themselves, for the purpose of defrauding the plaintiffs of their just proportions of the same; that the said *Samuel Osgood,* and *Mary* his wife, by virtue of her supposed authority under the will of *W. F.,* should execute conveyances in fee to *Norton* and *Clinton,* for all the residuary estate, for the small and inadequate sum, compared with its real value, of 25,000 dollars; and, in pursuance of such corrupt and fraudulent agreement, the sale and conveyance was made; and they insisted, that if *Samuel Osgood* and his wife have sold the lands for this inadequate considera-

1816.

Osgood
v.
Franklin.

[ * 7 ]

(a) It appeared that the original will could not be found, and that there had been two probates of it; one before *Cary Ludlow,* Esq., surrogate, the 22d of *August,* 1780, in which the words of the power to sell are as stated above by the plaintiffs in the cross suit: the other probate of it was before Judge *Tredwell,* the 15th of *August,* 1786, in which the words are as stated by the defendants, to wit: " I give to my executors *that may act,* and to the major part of them," &c.

11

1816.

OSGOOD
v.
FRANKLIN.

[* 8]

[* 9]

tion, through ignorance of their real value, their negligence in not ascertaining the value thereof, which might have been easily done, was so gross and inexcusable as to render them responsible for the full value of the lands. The bill prayed for an account; and that the sale and conveyances of the residuary estate might be set aside, and the estate sold, and the proceeds thereof distributed, &c.; or that *Samuel Osgood,* and *Mary* his wife, might account for it, at its true value, and all the title deeds, &c. be brought into Court, and that they account for the personal estate, &c. &c.

*The *answer* of *Samuel Osgood,* and *Mary* his wife, to the cross bill, was filed the 29th of *September,* 1809. They stated, that the executors were appointed on condition of not being discharged from their debts owing to the testator. That the power to sell, in the will, was in these words: " I give to my executors *that may act,* and to the major part of them, their heirs, or executors, full power to sell," &c., according to an authenticated copy thereof in their posses- sion; that the original will was not in their possession, nor did they know where it was, unless it was in the possession of the representatives of *John* and *Samuel Franklin,* as the defendant *Mary Osgood,* a few days after the death of the testator, delivered it to them, and it never has been in her possession, nor has she seen it since; nor has the said *Samuel Osgood* ever seen the original will. That *John* and *Samuel* were the only acting executors during their lives; that after the death of *Samuel,* the defendant *Mary,* and her husband, acted as executor; that all the debts and specific legacies had been paid. They admitted all the representative capacities and rights of the plaintiffs; that they have received 347 dollars, being the whole personal estate, except what may be due from those who are entitled to distributive shares; and that the debts so due ought to be deducted from their shares; that, as to the *real* estate of *W. F.,* all they know is, that among the papers delivered to them by the plaintiffs *Abraham* and *John,* executors of *Samuel Franklin,* deceased, there was ⋅a deed from *Peter Dubois* and others, to *W. F.,* dated *November,* 1772, for 12 lots of land, containing about 3,800 acres, on the south side of the *Mohawk;* another deed from the same persons to *W. F.,* for 4,400 acres, on the south side of the *Mohawk;* another deed from the same persons,⋅except *Dubois,* dated 5th of *January,* 1775, for 14 lots in *Tryon* county, con- taining 4,600 acres; that considerable parts of these three tracts were sold and conveyed by *W.* **F.* in his lifetime, and that other parts thereof were disposed of by *Samuel Franklin,* the acting executor, in his lifetime, by deed, in fee, perpetual lease, or by contracts with allowance for

12

improvements; but how much had been sold they did not know, though they had diligently inquired, particularly of the plaintiffs *Abraham* and *John*, who had refused to give any information on the subject; that nearly the whole of these three tracts was covered with settlers claiming title to the lands occupied by them; that, in 1791 and 1795, what land remained unsold of these tracts, was offered for sale by *Samuel* and *John Franklin*, the executors, for 5,000 dollars, being the original price paid by *W. F.* That after the death of *Samuel Franklin*, these defendants endeavored to trace the title of *W. F.* to these lands, and found that he purchased them at auction; that no information could be obtained from the plaintiffs *Abraham* and *John*, executors of *S. F.*; that it could not be discovered that the grantors to *W. F.* had any title. That *W. F.*, or his executors, had no actual possession of the lands, which were settled, and various persons claiming them had been in possession, in some instances 25 years, in others above 20 years, before the sale by the defendants, and in other cases 19 or 20 years; and that, according to the belief of the defendants, a large portion of these tracts was lost to the estate by the adverse possession of the tenants and occupants; that such was the belief of the defendants at the time of the sale by them, and was now their belief; that the defendants also received from the executors of *Samuel Franklin*, a deed from *John Brandon* to *W. F.*, dated the 4th of *July*, 1771, for an island in *Lake George*, containing 100 acres; another deed from *Joseph Fairlie*, dated 4th of *February*, 1771, for 200 acres on a neck of land on *Lake George*. That if the title to these parcels were good, the land was poor, and not worth more than 300 dollars. That they know nothing of any land in *Queensberry*, in the county of *Washington*, belonging to the estate of *W. F.* That they received from the executors of *Samuel Franklin*, a deed to *W. F.* for 2,363 acres of land on the *Susquehannah*, in 12 lots, which land is rough, and of no great value, and some of the settlers claimed title by possession. That they also received from the executors of *Samuel Franklin*, deeds for lands in the state of *Vermont*, to *W. F.*, which they specified, in *Hillsborough*, *Reading*, and *Hilton*, being 11,000 acres in the whole; a deed for 9 rights in *Cavendish*, and a deed for 14 rights in *Draper*, in the same state. That several of the titles were under the state of *New-York*, and were lost when *Vermont* became an independent state; that a considerable part of the lands have been sold for taxes, or lost by adverse possession; and for these causes, according to the best information and belief of the defendants, the title to all the lands in *Vermont* of *W. F.*, has

1816.

Osgood
v.
Franklin.

[ * 10 ]

13

become entirely lost and extinguished, excepting about 2,000 acres in *Cavendish*, which is mountainous, and of little value, and the settlers on which dispute the title of *W. F.* That to their knowledge, there are no other lands belonging to the estate of *W. F.*, and that they were satisfied there was no land of *W. F.* in the county of *Greene;* that they cannot describe the lands, or their value, more fully or accurately; and they set forth, in a schedule, all the deeds and papers received from the executors of *Samuel Franklin*, the 23d of *February*, 1808, for which they gave a receipt; and which were the only deeds or papers ever received by the defendants, relative to the real estate of *W. F.* That they never could obtain any information from the executors of *Samuel* and *John Franklin*, relative to the situation, quantity, or value of the said lands; that during a period of about 27 years, during which time the said *Samuel* and *John* jointly, and *Samuel* alone, as acting executors of *W. F.*, had the care of the estate, the lands were left exposed *to settlers and intruders, and were not taken possession of by any person in behalf of the estate; and the greater part was now claimed to be held by occupants, by adverse possession; that the lands are subject to the dower of the defendant *Mary Osgood*, and to the payment of quit-rents, large arrears of which were due. That, under all these difficulties and embarrassments, and as no part of the lands could be recovered without much litigation and expense, the defendants deemed it best for the estate, and for those interested, to sell the whole of the residue of the estate together, *en masse;* that in *June,* 1808, they agreed to sell to *Norton* and *Clinton* the whole of the said lands, for the sum of 25,000 dollars, and accordingly, on the 11th of *June*, 1808, executed a deed to *S. Norton* for *two thirds*, and to *Clinton* for one third thereof. That they were advised by counsel, that the defendant *Mary* had power to sell the real estate under the will of the testator; that, in their judgment and belief, the sum for which the lands were so sold to *N.* and *C.*, is their full value, and more than the defendants would have given for the same, under the circumstances stated. They fully and absolutely denied any collusion, corruption, or fraud whatever in the sale, or any secret trust, understanding, or agreement, relative to the same; and they claimed *one eighth* of the sum for which the said lands were sold. They further stated, that the plaintiffs, or either of them, before the sale, never applied to them to come to any settlement or distribution of the estate; nor had any, or either of the plaintiffs, since the sale, applied to the defendants to make void the same, and to have the property resold; nor had any of the plaintiffs
14

[ * 11 ]

suggested or pretended to them, or either of them, that the price obtained for the land was not its full value. That they used all the means in their power to obtain correct information relative to the value of the lands, and as to the titles, &c., and believe that the price for which *the lands were sold was a full and adequate price for the same.

1816.

Osgood
v.
Franklin.
[ * 12 ]

The *answer* of *De Witt Clinton,* filed *September* 26th, 1809, stated, that all the title deeds to the lands did not come into the hands of *Osgood* and *Mary* his wife; that the deeds from the original patentees to *Dubois* for the lands in *Cherry Valley* were supposed to be lost, and were recently discovered, by the defendant, to be in the hands of *W. North,* Esq. That in 1788, *Norton* proposed to become concerned in the purchase of the residuary estate of *W. F.* for 30,000 dollars, which he (*Clinton*) declined, thinking the price too high; that being informed, afterwards, that the purchase might be made for 25,000 dollars, he consented to be interested with *Norton,* and received a deed from *Osgood* and his wife for *one third* of the lands, dated *June* 11th, 1808; and a deed was given to *Norton* for two thirds of the lands, being all the lands of *W. F.* unsold in the *United States,* particularly in *New-York* and *Vermont.* That *Norton* made and completed the purchase. He denied all secret understanding, collusion, fraud, or unfairness between the parties in the transaction; and that he offered to give up the bargain, and *Osgood* refused. That a full price was given; and he believed that a higher price could not have been obtained. That the only tracts of much value lie in *Sharon,* in the county of *Schoharie;* in *Canajohary,* in *Montgomery* county; and in *Cherry Valley,* in *Otsego* county, being what are called the *Cherry Valley* lands. The first tract contained 3,800 acres, being in the patent to *P. Livingston* and others; the second, 4,400 acres; and the third, 4,600 acres; the two last tracts lying in *Young's* patent. That *Samuel Franklin* authorized settlers to occupy, and promised to pay for the improvements, which had greatly diminished the value of the lands to him and *Norton.* That most of the lands are held and claimed adversely to them, and they have been obliged to commence suits to recover *the possession of a great part of these lands, the result of which cannot be foreseen. That the county is considerably settled, but the lands are hilly and rough, and he cannot form a judgment of their real value. That the island and point of land in *Lake George* were worth one dollar per acre. That the 850 acres in *Queensberry* were on a perpetual lease, at one shilling per acre; and the value about 1,500 dollars. That there was a tract of 2,363 acres, conveyed by *Edward Dunscomb* to *W. F.,* the 22d *September,*

[ * 13 ]

1816.

OSGOOD
v.
FRANKLIN.

1771, lying in *Schoharie* and *Otsego* counties, but in what town he did not know, nor its value; but it was mountainous land, and the timber was, in a great measure, destroyed. That there was a tract of about 3,500 acres in *Greene* county, conveyed by *Ann Morris* and *Joseph Griswold* to *W. F.*, *April* 23d, 1774, but he did not know in what town it was situated. That *W. F.* had a claim in the *Waywayarda* patent in *Orange* county, but he understood and believed that the title was bad. That the titles to the lands in *Vermont* had been partly lost by the independence of that state, and part by sales for taxes, and to most of the lands there were claims of adverse possession, so that the whole was considered and believed to be of very little value. That he was advised by counsel that *Mary Osgood* had a good right of dower in all the real estate of which *W. F.*, her husband, died seised.

The *answer* of *John L. Norton* was substantially the same as that of *De Witt Clinton*.

Replications were filed to the issues and testimony taken in both causes, but chiefly in the cross cause, it being agreed that the depositions should be used in both.

The plaintiffs in the cross bill gave in evidence a release of *Mary Osgood*, dated *May* 11th, 1786, whereby she released to the executors of her husband, *W. F.*, deceased, all her right to dower in his estates, except such parts as were situate in the city of *New-York*, or on *Nassau Island*.

[ * 14 ]

*W. T. Robinson*, in or about *December*, 1806, had a conversation with *De Witt Clinton*, about the lands belonging to the estate of *W. F.*, in which *Clinton* said they were worth about 100,000 dollars; and the witness, a few days after, mentioned what *Clinton* had said to *Samuel Osgood*. Another witness stated, that he was at *Cherry Valley* in *July*, 1808, and saw *Norton* there, *who* was then surveying the lands, and said, he would not take 26 dollars per acre, and that he should not be obliged to bring many ejectments. Seven or eight witnesses, being persons living near the *Cherry Valley* lands, deposed, that in their opinion those lands were worth from 10 to 15 dollars per acre, in the year 1808. It was testified, that some of the land lying on the turnpike road was sold by the agent of *C.* and *N.* in 1809 for 15 dollars. That in 1786, Col. *Corsa* left a paper in *Cherry Valley* relative to the lands of *W. F.* That many of the settlers were waiting to purchase, if they were satisfied as to the title of *C.* and *N.* Others refused to acknowledge any title in *W. F.* or *C.* and *N.* That in 1808, *C.* and *N.* said their title was good.

*John Lawrence*, a witness for the defendants, testified, that some years ago he passed through the lands in *Cherry*

16

*Valley*, and was at the house of one of the settlers, who said, they had gone on the land under some agreement with the executors of *W. F.*, but no title had been given to the settlers.    That, afterwards, he was asked by *Samuel Osgood* what he would give for these lands, and whether he would give 25,000 dollars; and the witness said that, considering all circumstances, he would not give that sum in cash, for there might be trouble with the settlers.

Another witness testified, that in 1786, Col. *Isaac Corsa* was at *Cherry Valley*, and said, he was authorized to sell or lease the lands of *W. F.*; and left a paper containing the numbers of the lots and quantities, and inviting persons to settle on the lands; and that if the lands were sold to any *other persons, the settlers should be paid for their improvements, the value thereof to be ascertained by two persons mutually chosen by the parties.    The witness had lost the original paper, and had no copy.    That 50 or 60 persons, in consequence, settled on the lands, in expectation that the terms of settlement so held out would be fulfilled, and they claimed compensation for their improvements.    These terms were afterwards recognized in a letter of *Samuel Franklin*, written to some of the settlers, *June* 25th, 1791; and again, in *November* 27th, 1793.    *John* and *Samuel Franklin* gave a writing to the same effect, saying, that the settlers should have a preference as purchasers, or lessees.

*Samuel Campbell* proved the agency of Col. *Corsa*, and the recognition of it by *Samuel Franklin*, the executor, who conveyed to the witness, in 1791, 150 acres, at two dollars per acre.

*Jabez Hammond*, who was agent for *C.* and *N.*, deposed, that in 1808, all the settlers, except a few individuals, refused to attorn to *C.* and *N.*    Some of them denied the title of *C.* and *N.*, and others relied on their own adverse possession, and all refused to give up possession, unless paid for their improvements, according to the terms offered by *Corsa.*    That several suits were brought, and were still pending.    That some of the settlers sold their improvements for from nine to twelve dollars per acre; that the value of their improvements was, at least, one half the present value of the lands, and that under these embarrassments the value of the land was nominal only; that the timber had been much wasted; that the average value of the lands in *June,* 1808, was not more than two dollars and fifty cents per acre on an average.    That the whole quantity of the *Cherry Valley* lands, claimed by *C.* and *N.*, was about 12,000 acres, besides four lots, which had been sold by *Samuel Hake,* and for which *C.* and *N.* had brought suits, which were still pending; that if these lots were included, the whole would

1816.

OSGOOD
v.
FRANKLIN.

[ * 15 ]

1816.

Osgood
v.
Franklin.

*be about 13,000 acres. *Calvin Rich,* a witness, residing on the land, was of opinion, that in *June,* 1808, the lands, free from all embarrassments, were worth 12 dollars per acre. He stated, that the tenants, generally, refused to acknowledge the title of *C.* and *N.;* that the timber had been wasted, and that the compensation claimed for improvements, in general, exceeded the price of the land.

*S. Riker* deposed, that in 1809, 19,000 acres of land lying in *Belvidere* patent, in *Otsego* county, had been sold at auction in the city of *New-York,* at two dollars and fifty cents per acre; and on being put up a second time, brought only two dollars per acre.

Two of the plaintiffs, in the cross cause, *Abraham* and *John Franklin,* having been discharged under the insolvent act, in 1811, and one of the plaintiffs having died, a bill of *revivor* and *supplement* was filed the 25th of *February,* 1812, making the assignees of the insolvents, and the executors of the deceased plaintiff, parties; the assignees appeared d submitted their rights to the Court, and the bill was ken, *pro confesso,* against the others, and revived.

Afterwards, *Samuel Osgood,* one of the defendants to ne cross bill, having died, in *August,* 1813, and *Sarah Corsa,* one of the plaintiffs, having also died intestate, a bill of *revivor* and *supplement* was filed the 27th *November,* 1813, and the suit was revived against *Mary Osgood,* as executrix of the last will of *Samuel Osgood,* and against the administrations of *Sarah Corsa.*

On the 4th of *October,* 1814, *Maria,* the wife of *De Witt Clinton,* and *Sarah,* the wife of *John L. Norton,* were, by order of the Court, made parties to the suit; and *Mary Osgood* having died on the 6th of *October,* 1814, a third bill of *revivor* and *supplement* was filed the 1st of *December,* 1814, in which it was stated, that *Mary Osgood,* by her will, dated 27th of *July,* 1814, after certain specific legacies, devised the residue of her estate, real and personal, to her

[ * 17 ]

children, against whom, and the executors of *Mary Osgood,* who were her son and two sons-in-law, the bill was revived, and they are the present plaintiffs in the first original cause; and, with *De Witt Clinton* and his wife, and *John L. Norton* and his wife, are the present defendants in the cross cause.

The last bill of revivor and supplement to the original cross bill stated, that *Clinton* and *Norton* had sold parts of the residuary estate of *W. F.,* purchased by them, for more than 110,000 dollars, which has been paid part in money, and part by bonds and mortgages; and that they still held a large and valuable part of that estate unsold. *C.* and *N.,* in their answer, admitted that they had sold part of the lands, and retained certain parts thereof, but not having received

any accounts from their agents, they could not speak with certainty as to the amount, but did not believe it was 110,000 dollars.

The several causes came on to be heard together, on the 29th of *September* last.

*Harison, Colden, Slosson, Bracket,* and *Clark,* for the defendants in the original suit, and for the plaintiffs in the cross suit.

*T. A. Emmet,* contra, for *Clinton,* and the other defendants, in the cross suit.

*Riggs,* for the defendant *Norton.*

*Wells,* for the defendants *Norton* and *Clinton.*

*Baldwin,* for the defendant *Clinton.*

*S. Jones, jun.,* for the representatives of Mrs. *Osgood.*

The different points raised, and authorities cited on the *argument, are so fully stated and examined by the Court, that it is unnecessary to give the arguments of the counsel.

The cause stood over for consideration until this day, when the following opinion was delivered by the Court.

THE CHANCELLOR. The controversy between the parties arises in the cause which was commenced in 1809, between *Franklin and others against Osgood and others.* Two preliminary objections were raised by the counsel for the defendants.

1. That letters testamentary on the will of *Thomas Franklin* were taken out in *Pennsylvania,* and are of no force here.

2. That the assignees of *Abraham* and *John Franklin,* who are insolvent, ought to have been plaintiffs, instead of being defendants, as their interest, if any, is as plaintiffs; and that they cannot be made defendants, unless they had refused to be complainants, or were in collusion against them.

The production of a probate recently taken out in this state is a sufficient answer to the first objection; for it seems to be pretty well settled, that where no objection is raised by pleading, a probate taken out at any time before the hearing is sufficient, in this Court, to support the plaintiff's demand. (*Humphreys* v. *Humphreys,* 3 *P. Wms.* 351. *Fell*

1816.

OSGOOD
v.
FRANKLIN.

[ * 18 ]

*January* 15th.

A probate of a will taken out at any time before the hearing, is sufficient (when no objection has been taken by pleading) to support

19

1816.

OSGOOD
v.
FRANKLIN.

the plaintiff's demand.

On a bill of revivor, the assignees of a party become insolvent, cannot be made plaintiffs against their consent, and if they refuse, they may be made defendants.

A naked power to executors to sell does not, at common law, survive.

[ * 19 ]

[ * 20 ]

v. *Lutwidge*, 2 *Atk.* 120. *Patten* v. *Panton*, cited in *Bacon*, tit. *Exec.* (E.) pl. 14., edit. by *Gwillim.*) With respect to the second objection, the assignees could not be compelled to be plaintiffs; and it is admitted, that if they had not consented, they must have been made defendants. It is sufficient for the merits of the case that they are before the Court, and the objection goes only to a matter of form. But as the assignees have put in their answer as defendants, and have made no objection to that character, I would even infer their refusal to join as plaintiffs, if it were necessary, *in order to avoid any embarrassment from such an objection raised at the hearing.

1. The first question arising on the merits is, whether *Mary Osgood*, as sole surviving executor of *Walter Franklin*, deceased, was authorized to sell the real estate.

The part of the will of *Walter Franklin* relating to the question is as follows: " *The whole residue of my estate I give* and bequeath as follows: one eighth to *Sarah Corsa*, &c. ; one eighth to *Mary Wistar*, &c. ; to my wife, one eighth, &c. ; to my daughters, *Maria* and *Sarah*, each one eighth ; to my brothers, *John*, *Thomas*, and *Samuel*, each one eighth, &c. And *I order that the money or effects be distributed and divided from time to time, as it can be raised from my debts and estate by my executors, hereafter named*, &c.; and they are to keep a sufficiency undivided, to pay off. all legacies, and to keep the *estate* as much on interest or *rents* as they can for the general benefit. And *I appoint my wife with my three brothers aforesaid to be executors*, but on this condition, that if they owe me any money at my decease, their appointment, or acting as executors, shall not be a release of their debts, but the same shall be paid ; and if they do not act on this condition, they are not to be executors. *I give to my executors that* (they) *may act, and to the major part of them, their heirs or executors, full power to sell any or all my real estate not already devised*, &c. I give to each of my executors who shall act, 200*l*. in lieu of all other commissions and rewards, &c."

If the case turned upon the dry question, whether by the common law a naked power without interest to executors to sell, would survive, I should deem the authority of Lord *Coke* decisive. He lays down the rule repeatedly in his *Institutes*, (*Co. Litt.* 112. b. 113. a. 181. b.) as one well established, that the power would not survive ; and the same law was declared by *Dodderidge*, J., the contemporary of *Coke*, and author of the *Touchstone*. (*Shep. Touch.* tit. *Testament.* pl. 9. p. 429.) These writers were, in their time, and have been in every period since, regarded as oracles of the common *law, and they must have been familiar with the old author-

ities.  I do not, therefore, consider the observations of Mr. *Hargrave*, ( *Co. Litt.* 113. a. *note.*) even after giving them all the weight justly due to his talents and learning, as being sufficient to overturn a rule so strongly established; and especially when it has been shown by Mr. *Powell*, ( *Treatise on Devises*, p. 292—310.) that he is by no means borne out by the cases to which he refers.   The statute of 21 *Hen.* VIII. c. 4. affords no small confirmation of the doctrine in *Coke;* for the preamble declares the opinion that a sale by executors under a power in a will " can in no wise be good or effectual in the law, unless the same bargain and sale be made by the whole number of the executors named to and for the same."

But while I thus acknowledge the rule of the common law, I am equally satisfied that this cause is not governed by it. In the first place, this case comes within the exception stated by Lord *Coke;* for here was an interest sufficient to feed the power, and keep it alive in the hands of the surviving executors.   The executors were vested by the will with an absolute interest in an undivided moiety of the whole residuary estate, on which the power was to operate, and they were also directed to keep the whole of this residuary estate as much as possible on interest, *or rents,* for the general benefit.   This authority to lease, and this interest in the subject itself, must be sufficient to exempt the power from the character of a mere naked authority to a stranger.   It is not necessary that the interest coupled with the power should be a legal interest.   An equitable estate is sufficient, and is regarded in this Court as the real interest.   So it was held by Lord *Hardwicke*, in *Hearle* v. *Greenbank; (3 Atk.* 714.) nor does the character of the power depend upon the quantity of interest.   A trustee invested only with the use and profits of the land for the benefit of another, has an interest connected with his power.   This was so understood in *Bergen* v. *Bennett,* (1 *Caines's *Cases in Error,* 16.) and in *Eyre* v. *Countess of Shaftsbury,* (2 *P. Wms.* 102.) a testamentary guardian, with authority to lease, was held to possess a power coupled with an interest, and capable of survivorship.

In the next place, here was a trust charged on the executors, in the direction given to them to distribute the proceeds of the residuary estate; and according to the settled doctrine of the Court, the trust does not become extinct by the death of one of the trustees.   It will be continued in the survivor, and cannot be permitted, in any event, to fail of execution for want of a trustee.   In this case, one of the trusts under the will depended upon a sale. In *Garfoot* v. *Garfoot, (M.* 15

But if executors, having power to sell the real estate, are vested with any *interest,* legal or equitable, in the estate, the power survives.

[ * 21 ]

So if the executors are charged with a *trust,* relative to the estate, and depending on the power to sell, the power survives.

*Car.* II. 1. *Ch. Cas.* 35.) lands were devised to the wife for life, and then to be sold by the executors, for younger children's portions, and the wife and executors died, and the younger children exhibited their bill to compel the heir to sell; and on demurrer by the heir, on the ground that the executor had but an authority which died with him, the demurrer was overruled.   So, also, in *Barnes's* case, (Sir *Wm. Jones,* 352. *Cro. Car.* 382. S. C.) lands were devised to the wife for life, and then to be sold by the executors for payment of debts and legacies, or as one of the reports of the case says, to be divided among the nephews.   One of the executors died, and it was held, on a case sent from chancery for the opinion of the judges at law, that the survivor could sell, though the executors had an authority, and no interest.   Whatever, therefore, might have been the character of the power in this case, the strict rule of the common law could never be permitted, in this Court, to defeat the trust connected with the execution of the power.   Whether the residuary legatees might not have come in and taken the land itself, instead of the proceeds which the executors, as trustees, were to distribute, and thereby have arrested the execution of the power to sell, is a point not now before me. No such application was ever made; the power to sell was left by the legatees to its full operation; *and they come too late, after the sale, to make their election, or to raise such a question.

Either of these grounds appears to me to be sufficient to support the sale by Mrs. *Osgood,* as the sole surviving executor.   There are other considerations, also, which add great weight to this conclusion.

The intention of the testator is much regarded in the construction of these powers, and they are construed with greater or less latitude in reference to that intent.   It was evidently the testator's intention here, that the power should not fail as long as there was an executor to execute it, for the power is given even to the *major part* of the *acting* executors, and it was to descend to the legal representatives, both real and personal, of the executors.   In other words, it was made transmissible by descent and by will; and though it is left doubtful as to the portion of the executors from whom that transmission was to proceed, I should take the better opinion to be, that it was to proceed, as in the case of other joint interests or trusts, from the *last survivor,* and that the testator could not have intended such incongruity and confusion as the union of the heirs and executors of a deceased executor with the surviving executors.   The testator had also in contemplation the possible case of his wife acting alone; for he imposes a con-
22

If residuary legatees might come in and take the land itself, instead of the proceeds, it is too late, after a sale by the executors, to [ * 22 ] make their election.

In the construction of powers of sale, the intention of the testator is much regarded.

dition upon the other executors, without complying with which they were not to be considered as appointed.

I am satisfied, for these reasons, that it would be repugnant to the intention of the will, to the rules of law, and to the principles of this Court, to defeat a power uniting so much trust, confidence, and interest, by applying to it the strict doctrine of the common law, relative to mere naked authorities.

2. The next point made on the part of the legatees is, that the sale was a fraudulent breach of trust, and ought either to be set aside, or, if permitted to stand, that the representatives of *Osgood and his wife* ought to account *for the real value of the lands at the time of the sale, instead of the price at which they were sold.

The ground relied on in support of the charge of fraud, is the inadequacy of the price. I have examined the authorities on this point, and I am satisfied that it is not, of itself, and ought not to be, a justifiable cause of interference, unless the inadequacy be so gross as to be evidence of actual fraud.

I see no just pretext for the charge, that the sale was not made by the executrix and her husband in good faith; nor do I think that, under the circumstances of this case, there was any such inadequacy of price as to give color to the inference of fraud.

There is no case where mere inadequacy of price, independent of other circumstances, has been held sufficient to set aside a sale made between parties standing on equal ground, and dealing with each other without any imposition or oppression. And the inequality amounting to fraud, must be so strong and manifest as to shock the conscience and confound the judgment of any man of common sense. (Sir *Th. Clarke*, in *How* v. *Weldon*, 2 *Vesey*, 516. Lord *Thurlow*, in 1 *Bro.* 9. Lord Ch. B. *Eyre*, in 2 *Bro.* 179, *note.* Lord *Eldon*, in 9 *Vesey*, 246. Sir *William Grant*, in 16 *Vesey*, 517.) There is a very important distinction, which runs through the cases, between ordering a contract to be rescinded, and decreeing a specific performance. Though inadequacy of price is not a ground for decreeing an agreement to be delivered up, or a sale rescinded, (unless its grossness amount to fraud,) yet it may be sufficient for the Court to refuse to enforce performance. It is not an uncommon case for the Court to refuse to enforce for inadequacy, and at the same time refuse to rescind. The two cases admit of very different views and considerations. This whole subject was very fully discussed in *Mortlock* v. *Buller*, (10 *Ves.* 292.) which was the case of a bill for a specific performance of a contract of sale of land by the *defendant,

23

*1816.*

Osgood
v.
Franklin.

[ * 23 ]

Mere inadequacy of price is not sufficient ground for setting aside a sale, unless the inadequacy be so gross as to be, of itself, evidence of fraud.

But inadequacy of price, though not so gross as to amount to fraud, may be a sufficient ground for refusing to enforce a specific performance of a contract of sale.

[ * 24 ]

as agent of trustees.  The land was sold in *September*, for £26,500, and in *December* following, the plaintiff had contracted for the resale of a part only for £34,900, and the trustees refused to ratify the sale.  There was no imputation of fraud in the transaction.  The character of the parties was unimpeached, and though the plaintiff had neglected no previous means of information as to the value of the land, yet the chancellor said he was at full liberty to do so, and might honestly contract with persons at arm's length, and dealing for themselves.  But, he said, there was a want of care and attention on the part of the trustees, in not exerting a wise and full discretion as to a reasonable price, amounting to a breach of trust, and he thought himself not bound to afford relief to a purchaser who had contented himself with a contract, instead of a conveyance, and so dismissed the bill.  There can be no doubt, from the language of the Court, that if the conveyance had been executed, it would have stood, notwithstanding the inadequacy.  Thus, in *Day* v. *Newman*, cited in 10 *Vesey*, 300, Lord *Alvanley* refused to enforce a specific performance of an agreement for the sale, for £20,000, of an estate worth only £10,000.  There was no actual fraud in the case, but the inadequacy was so great that he would not enforce the contract against the seller, nor, on the other hand, would he sustain a cross bill to rescind it.

I need not multiply cases on this point.  The doctrine is settled, that in setting aside contracts, on account of inadequate consideration, the ground is fraud arising from gross inequality.  Unless the inadequacy does, of itself, *ex evidentia rerum*, prove fraud, the rule is, says Ch. B. *Macdonald*, (1 *Wightwick*, 109.) that inadequacy, by itself, has not the weight suggested.  If, indeed, advantage be taken, on either side, of the ignorance or distress of the other, it affords a new and distinct ground, not applicable to this case, and a very great inadequacy may form a presumption *of oppression.  (1 *Wightwick's Rep.* 28, 29.  3 *Ves. & B.* 117.) Dealing with young heirs, and for reversionary interests, is also watched with the utmost jealousy, and constitutes a particular class of cases, forming another exception to the general rule, that for mere inadequacy of price a contract is not to be set aside.  (*Evans* v. *Peacock*, 16 *Vesey*, 512.  *Gowland* v. *De Faria*, 17 *Vesey*, 20.)  So, leases of charity estates will be set aside for an undervalue, if considerable, though there be no imputation of fraud, on grounds peculiar to that trust.  (18 *Vesey*, 315.)  But none of those exceptions to the general rule apply to this case.  Here is no imputation on the character of the parties, and there is no appearance of undue means or influence, or of the practice of

[ * 25 ]

24

any kind of imposition. The most that can be said is, that the property would have been vastly more productive, if the executor had taken more pains to ascertain the title, and had made the sales in small parcels, and to settlers upon credit. As the property was situated at the time of the sale, I do not believe, from any proof in the case, that the land could have been sold at that time, in one entire parcel, at a better price. The testimony of *John Lawrence,* and of *Samuel Riker, jun.*, serve to confirm me in this opinion. The land at that time was, in general, heavily encumbered with adverse claims and pretensions. The former acting executors, who were then dead, and whose representatives are among those who are now seeking to impeach the sale, had suffered all this residuary estate to lie unregarded for upwards of twenty years, and adverse possessions were fast closing upon the *Franklin* title. These possessions (I speak now of the *Cherry Valley* lands, and which, indeed, are the only lands of much moment in the case) were generally held under a contract made in 1786, by Col. *Corsa,* as assumed agent of the executors, and whose agency and contract the executors, or one of them, had ratified. By this contract, the settlers were to be paid *for their improvements, if they did not purchase. This claim was a great encumbrance on the title. It is well known, that improvements made by settlers are generally valued quite high; and it is in proof in this case, that such claims exceed, in many instances, the value of the land at the time the settlement was made. I do not perceive, from my present view of the claim under Col. *Corsa,* as shown by proof here, but that it might have been established in equity, if the application had been made in time. There were likewise defects in the chain of title, which had excited a general distrust of its validity; and this title was not made complete until the discovery of the release of the original patentees to *Dubois,* some time after the sale in question. It was found in the possession of *William North;* and as the former executors knew nothing of this paper, Mrs. *Osgood* had good reason to presume that it was irretrievably lost. There is no doubt this estate has suffered greatly by negligence, but it was a negligence of 20 years' standing, imputable, in a great degree, to the *two* former executors, who had the sole management of the trust.

These difficulties, in the way of title, have been justly and strongly urged, to show that the price is not to be charged with inadequacy, under all the circumstances of the case. Lands in such a situation have no determinate value, and they are not to be estimated by the price of improved farms, or lots which have a clear title, and may yield a known and steady rent. Accidental subsequent advantage made of a

*margin:* 1816.

OSGOOD
v.
FRANKLIN.

[ *26 ]

OSGOOD
v.
FRANKLIN.

1816.

[ * 27 ]

A *trustee* is not chargeable with imaginary values, or more than he has received, unless there is evidence of gross negligence, amounting to wilful default.

[ * 28 ]

bargain, is nothing, according to Lord *Eldon*. (*Coles v. Trecothick,* 9 *Vesey,* 246.) If we were to take such a ground, every transaction of this kind would come into a Court of equity. The purchasers in this case immediately bestowed the utmost diligence to assert their title and recover the lands, and by the fortunate discovery of title deeds, and by still more fortunate suits and negotiations, they must have been able to avoid the statute of limitations, and to escape the embarrassment of the claim for improvements, and have *turned their speculation to great advantage. I see nothing unusual in this, nor any thing censurable on the part of the purchasers; and the suit as against them ought to be dismissed, with costs.

I have confined my attention solely to the circumstance of inadequacy of price, because no other was stated or urged by the counsel, and no other has occurred to me, as evidence of fraud. The only question of any serious doubt in the whole case, is, whether there was not a want of attention and vigilance on the part of Mrs. *Osgood,* amounting to a breach of trust, so as to render her representatives chargeable beyond the moneys actually received. I think, upon the whole, this would be too rigorous a conclusion. A Court of equity, according to the lord keeper, in *Palmer* v. *Jones,* (1 *Vern.* 144.) never charges a trustee with imaginary values, or with more than he has received, unless the proof be very strong of supine negligence. Lord *Thurlow* said, it must amount to a case of wilful default. (1 *Vesey, jun.* 193.) Mrs. *Osgood* had an interest of one eighth in this residuary estate, and though the sale was to her two sons-in-law, yet she had children living by her second husband, Mr. *Osgood;* and she and her husband never could have made an intentional sacrifice of that estate, because it would have been sacrificing their own interest, and that of their other children. In that sale, then, it may be said, they took the same care of the interest of others as of their own. There were many considerations that might have had a rational and powerful influence on the minds of Mr. and Mrs. *Osgood.* This estate had been for more than twenty years under the sole care and management of the other executors, who were equally legatees, and who had suffered the estate to fall into ruin. The title was handed over to Mrs. *Osgood* in an embarrassed and doubtful state, and a very considerable part of the claim under the testator was null and void. This was the case with the *Wawayanda* claim, and *with the lands in *Greene* county, and most of the lands in *Vermont.* The only valuable property was the *Cherry Valley* lands, and they were covered with adverse possessions, and with settlers, under burdensome claims for improvements. What was the executor to do?

26

To undertake to recover these lands might lead to great expense, which would eat up the value of the estate. They aver, in their answer, that they deemed it best for the interest of the legatees, to sell, at once, the whole estate for the best price that could be obtained; and there is no reason to doubt the sincerity of this allegation. Whether that was or was not the most advisable course, under the then existing circumstances, was a difficult question, on which intelligent and prudent men might differ. I do not think that I am bound, by any principles in this Court, to deal so hardly with *Osgood* and his wife, as to make either of them responsible, as trustees, for an error of judgment, and I shall, therefore, not hold them answerable beyond the amount of the sale.

In arriving at this conclusion, I have been much governed by a view of the peculiar situation of the property when the trust was assumed by Mrs. *Osgood,* and of the desperate condition to which it was reduced by the folly and negligence of the former executors, and the tacit acquiescence of all parties in interest. The case would have been very different if she had been an acting executrix from the beginning. To exact of her a responsibility for the defaults of others, would be unjust. When she assumed the trust, in 1807, she was under the necessity of commencing, at once, a series of extraordinary efforts, and of expensive litigation, sufficient to strike ordinary minds with dismay, or of closing the concern of the administration of the estate by bringing the whole interest to market. There was no time for delay. One course or the other must have been pursued immediately, or the property abandoned forever. If she did not elect the most judicious course for the interest of the trust, she elected the other, with the best *advice of her husband, and in perfect good faith. Of this there is no doubt. I cannot but think that the charge of an abuse of discretion does not come with great weight or equity from *cestui que trusts,* who are partly representatives of the former trustees, all of whom have been silent spectators of the manner in which the former trustees had conducted.

I shall, accordingly, decree, that the bill against the purchasers be dismissed with costs, and that the usual reference be made to a master to take and state an account between the representatives of Mr. and Mrs. *Osgood,* as executrix, on the one part, and the respective claimants of the residuary estate of *W. Franklin,* deceased, on the other: in taking which account, the estate of Mrs. *Osgood* is to be charged with the actual amount of sales and other moneys received, and no more, and the executors of *John, Thomas,* and *Samuel Franklin,* deceased, to be charged with the debts due from

1816.

OSGOOD
v.
FRANKLIN.

[ * 29 ]

27

their testators respectively, to the estate of *Walter Franklin*, deceased; and the question of costs, and all other questions, to be, in the mean time, reserved.

Decree accordingly. (*a*)

(*a*) This decree was affirmed by the Court of Errors, on appeal, the 8th of *April*, 1817.

[ * 30 ]                   *HOLRIDGE *against* T. and T. B. GILLESPIE.

If a mortgagee, executor, trustee, tenant for life, &c., having a limited interest, gets any advantage by being in possession, or otherwise, in obtaining a new lease, he is not allowed to retain it for his own benefit, but must hold it for the mortgagor, or *cestui que trust*.

Where the plaintiff assigned the lease of a farm to secure the payment of a debt due to the defendant; and the parties, afterwards, entered into an agreement, by which the plaintiff, in consideration of a sum of money expressed, but not, in fact, paid, agreed to give up to the defendant one half of the farm, and the defendant entered into possession of the premises, and surrendered the lease to the landlord, and took a new lease for an extended term of years; it was held that the plaintiff was entitled to redeem the whole premises, and, on such redemption, to have the entire benefit of the new lease.

*Nov.*11th, 1815,
and
*Jan.* 15th, 1816.

THE plaintiff, being possessed of a lease from *B. W.* and others, of a farm of about 309 acres, (parts of lots 8, 9, and 10, in *Crosby's* manor,) dated in *November*, 1806, for eleven years, subject to an annual rent of 75 dollars, on the 26th of *May*, 1808, assigned the lease to the defendant *Thomas Gillespie*. The assignment was absolute; but the assignee, at the same time, executed a defeasance, declaring that the assignment was made to secure a debt of 74 dollars and 12 cents, due from the plaintiff to *Thomas Gillespie*, with interest. Part of the land was cultivated and improved. In *April*, 1809, the defendant *T. G.* took possession of the improved part of the farm. On the 29th of *August*, 1809, the plaintiff and defendants entered into an agreement, under seal, by which the plaintiff acknowledged that he had received of the defendants 100 dollars, as a compensation for one half of his improvements on the lot, and he gave up one half of the premises to the defendant *T. G.*; and, to secure to *T. G.* 75 dollars, with interest, together with what might afterwards become due to the defendants, the plaintiff gave up the lease to *T. G.* until the 75 dollars and interest, and

[ * 31 ]   moneys to become due, should be paid, *and *T. G.* engaged
28