Lehigh Coal and Navigation Co. *v.* Central Railroad Co.

---

The Lehigh Coal and Navigation Company

*v.*

The Central Railroad Company of New Jersey.

1. Only the parties to a contract, or their legal representatives, are bound by it, or liable at law for breaking it.

2. A receiver of an insolvent railroad corporation has authority to make such contracts for labor and supplies as are reasonably necessary to enable him to perform the duties of his appointment, and equity will enforce such contracts against the trust.

3. But contracts made by a preceding receiver impose no legal duty or obligation on his successor, and damages cannot be recovered at law against the succeeding receiver for refusing to perform the contracts of his predecessor.

4. The duties of a succeeding receiver, in respect to the contracts of his predecessor, are only such as, in view of all the circumstances of the case, it is equitable to impose—such as, with the light before. him, the succeeding receiver can perform without risk of personal liability and with safety to the trust.

5. If the circumstances surrounding the particular transaction are such as to justify reasonable doubts respecting the validity or fairness of the contracts, it is the duty of the succeeding receiver to decline to perform them until he shall be directed to do so by the court.

6. Damages should not be allowed for the non-performance of a contract which the court has directed its officer not to perform.

7. A court of equity will in no case enforce the specific performance of a contract made by a trustee in breach of his trust.

8. Where neither party to an action represents a testator or intestate, although one of the parties to the transaction out of which the suit grows is

dead, the living party is competent to speak as a witness as to what was said and done by the other.

9. But his evidence, in order to be worthy of full credit, should either be corroborated on material points or be so full and convincing as to persuade the court of its entire truth.

On petition of Edward W. Vanderbilt and Edward M. Hopkins, and answer by Henry S. Little, receiver, and replication by petitioners, and proofs taken in open court.

*Mr. A. Q. Keasbey* and *Mr. Barker Gummere,* and *Mr. George H. Adams* of New York, for petitioners.

*Mr. John L. Conover* and *Mr. Benjamin Williamson,* for receiver.

VAN FLEET, V. C.

This is a case of unusual novelty. The petitioners, Edward W. Vanderbilt and Edward M. Hopkins, are before the court seeking a remedy for the recovery of the damages which they allege they have sustained in consequence of the refusal of the last receiver of the Central Railroad Company of New Jersey to perform certain contracts which they allege they had made with the first receiver. The petitioners allege that they made a large number of contracts with Francis S. Lathrop, the first receiver of this corporation, for the supply of railroad material, which were in course of execution when he died, and that his successor, Henry S. Little, allowed them, for between three and four months after he became receiver, to continue to furnish the material required by the contracts, and then causelessly and wrongfully refused to receive the residue of the material deliverable under the contracts, and that in consequence of such refusal they have sustained very heavy damages. They state that their damages exceed $120,000, and the principal object of the present proceeding is to procure a remedy by which they may be recovered.

Receiver Lathrop was appointed March 14th, 1877, and died March 3d, 1882. His successor was appointed the next day, March 4th, 1882. The petitioners held, at the time of

Receiver Lathrop's death, thirty orders for the delivery of railroad supplies, consisting of lumber and cross-ties, exceeding in value, according to the estimate of the petitioners, $500,000. Nearly $200,000 of the whole quantity deliverable under the orders was delivered and paid for between Receiver Lathrop's death and the 15th of June, 1882. On the date last named, Receiver Little gave the petitioners notice that he would not accept the balance of the material covered by the orders. That notice is the origin of the present controversy. All the orders are the same in form, differing only in date, number and the character of the material described in them. The first in date will be used as a specimen. It reads as follows :

"F. S. Lathrop, Receiver.
    "Central Railroad Company of New Jersey.
        "Office of the General Purchasing Agent,
" No. 957.                          119 Liberty Street.
" B. W. Burnett.                    New York, January 3d, 1880.
" Please furnish, on account of the Receiver of the Central R. R. of New Jersey —
" [Here follows a description of the material ordered.]
                                        " B. W. Burnett,
                                        "*General Purchasing Agent.*"

Two of the thirty orders held by the petitioners were issued in 1880 ; one on the 3d of January, and the other on the 3d of November. Eleven were issued in 1881 ; five on the 2d of April, one on the 4th of April, one on the 25th of September, one on the 18th of October, one on the 12th of November, and one each on the 9th and 10th of December. And seventeen were issued in 1882 ; four on the 14th of January, eight on the 17th of the same month, two on the 20th, one each on the 9th and 20th of February, and the last on the 3d of March, the day that Receiver Lathrop died. The orders were all issued, as the petitioners claim, in pursuance of contracts made with Receiver Lathrop in person, and not with the purchasing agent. The course pursued in making the contracts, Mr. Vanderbilt says, was this : he would go to Receiver Lathrop and make a bargain with him, agreeing upon the quantity, quality and dimensions

of the material, and also upon its price. The receiver would then send for his purchasing agent and direct him to issue an order. Mr. Vanderbilt also says that there were instances when the purchasing agent was not called to the presence of the receiver, but, after he and the receiver had concluded a bargain, the receiver would give him a memorandum, in writing, and tell him to take that to the purchasing agent, and direct him to issue an order; and that there were also instances in which he took nothing but a *verbal memorandum* from the receiver to the purchasing agent, and obtained orders. And the purchasing agent testified that he had drawn some of the orders, on which the petitioners rest their right to damages, without any personal direction from the receiver, but simply upon the verbal statement of one of the petitioners that the receiver had directed that an order be issued. He says the reason that he pursued this incautious course of conduct was the confidence which he knew the receiver reposed in the petitioners.

Eight of the orders were issued for cross-ties. They each state a price for which the ties are to be furnished. None of the others, with a single exception, stated, when they were issued, the price of the material. That this was their condition when issued is proved conclusively. Press copies of the orders, taken at the time of their issue, have been offered in evidence. Twenty-one of these copies are without a price, in ink; nine of the twenty-one now have prices stated on their faces written with a lead pencil, the other twelve state no price whatever. Twenty-eight of the thirty orders contain no stipulation as to when delivery of the material described in them should be made, the other two contain provision upon that subject. No. 2075, dated November 12th, 1881, states that the material is wanted as early as possible, and No. 2228, dated January 20th, 1882, states that the material will be required during 1882. This synopsis presents the orders in sufficient detail to show the character of the papers on which the petitioners found their claim. The first question which the case presents for decision is, Did his appointment as receiver impose any duty upon Henry S. Little in respect to these orders? Receiver Lathrop had authority to make

contracts for the purchase of such supplies as might to him seem necessary. By an order made on the 23d of March, 1877, the chancellor directed Receiver Lathrop to keep the works of the defendant corporation in good condition and repair, so that they might be efficiently operated, with advantage to the corporation and its creditors, and with safety and convenience to the public, and to that end power was granted to him to contract for and purchase and pay for such materials and supplies as might seem to him necessary and proper in the exercise of a wise discretion. There can therefore be no doubt that Receiver Lathrop had authority to make contracts like those on which the petitioners base their claim. But this does not go far enough to show that the petitioners are entitled to relief. Or, even if we say that Receiver Lathrop made the contracts in question, still we do not go far enough to show that Receiver Little was subject to any legal duty in respect to them.

I think it must be regarded as entirely clear, as a matter of law, that contracts made by Receiver Lathrop created no legal obligation against his successor. In a previous proceeding between the same parties in relation to these orders, the vice-chancellor pronouncing this opinion said : " I have always supposed the law on this subject to be so firmly settled as to be beyond all question, and that it had become an axiom that only the parties to a contract, or their legal representatives, were bound by it, or liable at law for breaking it. It is certain the present receiver is no party to these contracts. He neither negotiated them nor assented to them. He has not been directed by the chancellor to perform them. It is not possible, therefore, for me to see how he was under the least duty to perform them, nor under what legal rule he can be held liable at law for not performing them. He cannot be said to have broken them, because he was under no obligation to perform them. He had promised nothing and could not, therefore, be required to perform anything. He is not the representative of his predecessor. In his character as receiver his predecessor can have no representative, in the legal sense of that term. He was, at best, a mere agent or instrument, and when he died his power died also, and he left nothing

behind him, as receiver, of either property or power, in which he can be represented so as to make his acts binding on his successor." *Lehigh Coal and Navigation Co.* v. *Central R. R. Co. of N. J., 11 Stew. Eq. 175.* I adhere to this view. I still think it is correct and sound. *Kerr v. Little, 12 Stew. Eq. 83,* is a case where the complainant was seeking a remedy against Receiver Little for the recovery of damages sustained in consequence of the breach of a contract made by Receiver Lathrop. The complainant's right to maintain a bill in equity was disputed by demurrer. In overruling the demurrer the chancellor says : " He [the complainant] cannot maintain an action [at law] against the present receiver on the contract, for he did not make it."

As a legal proposition, nothing, as it seems to me, can be more obvious than that the appointment of Mr. Little as receiver imposed no legal obligation or duty upon him in respect to these contracts. A receiver of a railroad is the officer of the court appointing him. He represents the court. The property in his hands is *in custodia legis.* He has only such power and authority as are given to him by the court, and he is subject to such duties, and such only, as are prescribed by general law or the order of his appointment. In this case, the order appointing Mr. Little imposed no duty whatever upon him in respect to these contracts. It simply put him in the place and stead of Receiver Lathrop, and authorized him to take possession of the estate and effects of the corporation, and to conduct and manage its business under the supervision of the court, and to do such other acts as the corporation itself might have done. I know of no principle of the common law which declares that in such a case the succeeding receiver shall perform the contracts of his predecessor, or which imposes any duty whatever upon him in respect to the contracts of his predecessor. Nor do I know of any principle which would justify a judicial declaration that, in such a case, the receiver is the agent or representative of the corporation, empowered to bind it by his contracts, and that in consequence of such relation, a succeeding receiver becomes bound, as a matter of law, to perform the contracts of his pre-

decessor as the obligations of the principal whom he represents. To me it seems to be unquestionable, as a matter of law, that the contracts of Receiver Lathrop were without the least legal force against his successor.

But it is said that these contracts bound the trust; in other words, that having been made by an officer of the court, who was charged with the duty of managing and operating a railroad of which the court, in the discharge of its duty, had taken possession, and being such as such officer had authority to make, and as the proper discharge of his duty required him to make, the contracts became, in equity, the moment they were made, the obligations of the trust, which the administrator of the trust, whether the original appointee or a successor, was bound to perform, and which, if he did not perform, would render the trust liable for any damages resulting from their nonperformance. This view, it will be observed, rests on this very important consideration of fact that the making of these contracts were steps which the first receiver was necessarily required to take in the proper discharge of his duty, being just as indispensable to the faithful discharge of his duty as the employment of competent subordinates to manage and run the trains. And from this it is argued that the contracts, being such as the receiver was necessarily required to make in the proper performance of his duty, they must, in order to prevent injustice and wrong, be regarded as the obligations of the trust, the trust property being the principal in the transaction and the receiver its mere agent, so that whoever undertakes the care and management of the trust property becomes subject to the duty of performing the contracts as a part of the duties which he assumed in accepting the office of receiver. Although this doctrine is entirely novel, and perhaps without an analogy in the whole field of jurisprudence, still I am not prepared to say that it should not be adopted in a proper case and under circumstances where its adoption would further justice, and give a remedy for a wrong which otherwise would be remediless.

Legal rules and remedies must be made to conform to the exigencies of the times. They must be made to adapt themselves

to new business methods and altered circumstances as they arise. The insolvency of a railroad corporation presents an anomalous state of affairs. There is no difficulty in dealing, according to established methods, with other insolvent corporations, such as manufacturing, banking and insurance companies. When such a corporation becomes insolvent, the court may at once stop its operations by injunction, take possession of its assets, convert them into money and make distribution. In the great majority of cases, it is not necessary to the protection of the interests of creditors or others that the business of such corporations should be continued after the fact of insolvency is established; on the contrary, experience has demonstrated, that, as a general rule, the sooner a conversion of the assets can be effected and distribution made, the better for all concerned. But an insolvent railroad corporation cannot be dealt with in this manner without destroying both public rights and private interests. The principal object the state has in view in the creation of such a corporation is to provide a highway, which the public shall have a right to use at all times, under such regulations as the legislature may see fit to prescribe. As soon as the road is completed and put in operation, the public acquires· a right to its use, which continues in full force until the sovereign authority relinquishes it, and this right is neither lost nor impaired by the insolvency of the corporation operating the road. The legislature has expressly declared that railroads operated by insolvent corporations shall, notwithstanding their insolvency, be operated for the use of the public. *Rev. 196 § 106.* The public right is clear, and must be upheld. It is equally clear, at this day, that the best means by which the most valuable part of the property of a railroad corporation can be preserved and saved from ruinous deterioration is by continuing the road in full operation. Both public right and private interest make it necessary, therefore, that the works of an insolvent railroad corporation should be continued in operation after the fact of insolvency has been ascertained and adjudged judicially. This, it is obvious, cannot be done unless authority exists somewhere to make contracts which shall bind the trust, and which shall continue in force

after the person who made them has ceased, by death or otherwise, to have the power or ability to perform them.   According to both reason and analogy, the proper repository of this authority is the receiver.   The law never imposes a duty without giving the person charged with its performance sufficient power to do his duty.   And therefore I think that it must be held that the receiver of an insolvent railroad corporation has authority, as a thing necessarily incident to the duties imposed upon him, to make all such contracts for labor and supplies as are reasonably necessary to enable him to perform the duties of his appointment, and that his contracts for such purposes bind the trust.

But conceding that the receiver has this power, and that his contracts are entitled to the effect above attributed to them, a very important question remains to be considered.   In a case like the present, where the contracts, in respect to which damages are claimed, were made by a receiver who, since they were made, has been removed by death, and the claim for damages grows out of the refusal of his successor to perform the contracts, the situation is so novel in its legal aspects as naturally to provoke doubts whether the claim for damages can be awarded as compensation for a legal wrong.   Where there has been no breach of duty or violation of law, there can be no damages.   The effort here is to make the refusal of a person who was not a party to the contracts, and under no legal duty in respect to them, to perform them, the ground for adjudging that the property in his hands is liable for the damages consequent upon their non-performance.   In this condition of affairs, the material inquiry, as it seems to me, is this : Is the person claiming damages in such a case in a position to be entitled to them unless he has taken the precaution to procure contracts in such form, and so certain and definite in all their material terms, that the succeeding receiver can, by bare inspection, see and know that they are obligations of the trust which it is his duty to perform ? The succeeding receiver occupies a fiduciary position.   He is to protect the property and interests committed to his charge with a jealous vigilance ; he is to exercise his best skill, sagacity and

judgment in the discharge of all his duties, and if claims be
asserted against the property in his custody, arising out of trans-
actions which occurred prior to his appointment, and concerning
which he has no personal knowledge, and which, on examina-
tion, appear to him to be questionable, his duty requires him to
resolve his doubts against the claimant and in favor of the trust,
and to refuse to recognize the claims as obligations of the trust
until directed to do so by the court. Under such circumstances,
it is clear that he could not recognize the claims without incur-
ring serious personal risk. The law does not require impossi-
bilities. Where the act to be done is one of discretion or
judgment, no obligation to act arises until the person who is to
do the act is qualified by the requisite knowledge to decide what
should be done. It would seem, then, to be obvious that the
most that can be said in the way of laying down a general prin-
ciple which will give the least support to the claim of the peti-
tioners, is this: that the duties of a succeeding receiver, in
respect to the contracts made by his predecessor, are only such
as, in view of all the circumstances of the case, it would be
equitable to impose—such as with the light before him, he can
perform without risk of personal liability and with safety to the
trust. It is easy to state circumstances under which it would
seem to be entirely clear that the succeeding receiver should be
required to perform the contracts made by his predecessor.

Take this very case. Suppose it had appeared that the con-
tracts, which the petitioners asked Receiver Little to perform,
had all been made shortly before Receiver Lathrop's death, and
that they had been for such material, both in quality and quan-
tity, as the different heads of department had estimated would
be required, for the year 1882, to keep the works in a proper
state of repair, and that each contract had fixed the price which
should be paid for the material designated in it, or provided a
method by which the price to be paid should be ascertained, and
had also limited a time within which the material should be
delivered, then I think there can be little doubt that it would
have been the duty of Receiver Little to perform them. The
contracts would then have furnished satisfactory evidence on

their faces that they had been cautiously made; they would have furnished, in themselves, full evidence of all their material terms, and if Receiver Little had had any doubts respecting whether or not they were provident and judicious, the evidence necessary to remove his doubts would have been readily accessible to him.

Such, however, is not the character of the contracts on which the petitioners base their claim. They are all imperfect and incomplete in some material point; indeed, so imperfect that it was impossible, when performance was demanded, for any person, not a participant in their negotiation, to determine, from an inspection of them, whether they were understood by the parties to be completed contracts or mere steps in the negotiation of contracts. Receiver Little had no personal knowledge concerning them; he was a stranger to them, and they were so incomplete, in material parts, that an inspection of them would naturally raise doubts in the mind of any discreet person whether, if the material covered by them was accepted, the trust would not be burdened with material it did not need, and which it was under no obligation to take. After Receiver Little's appointment, the petitioners did not go to him and show him the orders, and ask his direction as to when the material should be delivered, but proceeded to make delivery of it with the utmost speed. Although the orders contain no agreement as to when delivery shall be made, and notwithstanding no bargain had been made upon that subject with Receiver Lathrop, further than that the petitioners say that it was Receiver Lathrop's habit, during the period of their transactions with him, to make the most of his contracts, for the material required during the succeeding year, in the months of December and January, yet it appears that the petitioners, after Receiver Lathrop's death, proceeded, without the slightest conference with Receiver Little or any of his subordinates, to make delivery of the material covered by the orders so rapidly that early in the month of April, 1882, the usual places of storage were all full, and it became impossible for the receiver to accept further material without providing new and additional places for its storage. The petitioners were then notified that the deliveries must stop, and also that a great deal

of the material which they had already delivered could not be used during the next year, and that some of it could never be used. The conduct of the petitioners, in hurrying the material forward with such unusual rapidity, naturally excited strong suspicions in the mind of Receiver Little that the petitioners were attempting to take advantage of the trust in consequence of the death of Receiver Lathrop. He was in a position where it was his first duty to guard the interests of the trust with a jealous care, and when it is remembered that the orders were all imperfect, as contracts, in some essential particular; that they were all unilateral—the receiver being bound and the petitioners free; that they embraced what would seem to most persons an immense amount of material, and that several of them were more than a year old, and the material covered by them should there-fore according to the usual course of business in such cases, have been delivered in Receiver Lathrop's lifetime, it is quite manifest that Receiver Little was placed in a situation where it was impos-sible for him to perform the contracts without incurring personal risk or endangering the interests of the trust. His situation made his duty plain; his duty to the trust required him to re-fuse to perform the contracts until the court should give him direction to perform them.

That is the course he pursued. In June, 1882, he gave the petitioners written notice that he would not perform the con-tracts. The petitioners then applied to the court, by petition, for an order directing the receiver to perform the contracts. The receiver answered, and the issues thus made up were tried, and the trial resulted in the dismissal of the petition. The reasons why relief was then refused are fully stated in the opinion of the court, and need not be repeated. *Lehigh Coal and Naviga-tion Co.* v. *Central R. R. of N. J., 8 Stew. Eq. 426.* The order dismissing the petition remains in full force. An appeal was taken from it which was subsequently abandoned pursuant to an arrangement between counsel that the questions raised by the present petition should be heard and decided " in the same manner, with respect to the rights of the parties, as if no pro-ceedings had been theretofore taken concerning the same." I

shall not stop to discuss the effect of this arrangement further than to say that if it was designed to make nugatory a direction which this court had given to its officer in the discharge of his duty, and thus render his failure to do certain things, which this court had ordered him not to do, a ground for charging the property in his hands with damages, it must be disregarded, and treated as a nullity.

This, then, would seem to be the condition of the claim of the petitioners : Receiver Little was under no legal duty to perform the contracts on which the petitioners base their claim for damages. In view of the condition in which those contracts were when Receiver Little was asked to perform them, and also of the conduct of the petitioners in respect to them, his duty to the trust required him to refuse to perform them until otherwise directed by the court; and when the question, whether he should be required to perform them or not, was referred by the petitioners to the court, the court, after fully hearing them, by both proof and argument, directed the receiver not to perform them. Now, although it is true that, in an ordinary case, a decree denying specific performance does not operate as a bar to an action on the contract to recover damages for its breach, yet, in a case like the present, where the person against whom specific performance was sought was an officer of the court, subject to its control and bound to do or refrain as it might direct, and the ground upon which specific performance was asked was a pure matter of equity, the party asking it being without a title of legal right, a direction by the court to its officer not to perform should, in view of the character of the proceeding, as it seems to me, be regarded as a judgment that the person seeking the aid of the court was not entitled to any relief whatever ; in other words, that the judgment should be construed as a judicial declaration that he is entitled to neither specific performance nor damages. The court should not first order the receiver not to perform the contracts, and then charge the property in his hands with damages because he did not perform them. The petitioners, on the application for specific performance, were bound to demonstrate to the court that they were entitled to what they asked,

Lehigh Coal and Navigation Co. v. Central Railroad Co.

or fail. If their application failed because they did not make as strong and as perfect a case as the real facts would have enabled them to make, had they been more diligent or careful than they were, the damages they suffered subsequent to the decision of the court did not result from the wrongful act or refusal of the receiver, or from the error of the court, but from their own negligence. In the decision of questions of fact, the court can allow its judgment to be guided by nothing but the evidence laid before it, and when a suitor has had his day in court, and the opportunity which the law gives every litigant to present his facts and his law, and he presents them and then calls for judgment, and the court pronounces judgment, he stands concluded by the judgment. He must submit or appeal. He cannot treat the judgment as a finality if it pleases him, and as a nullity if it does not. The court took possession of the property of this corporation, in obedience to the command of the law, to preserve it. That duty it was bound to perform according to the best of its light and knowledge. In my judgment, it would not only fail in the discharge of this duty, but also in that consistency of action which must, if justice be done, always characterize judicial conduct, if it were now, after having first directed the receiver not to perform these contracts, to charge the property in his hands with damages because he did not perform them. A management which should be attended by such consequences to the property managed, would, as I think, be more correctly described as waste than preservation.

But, in my judgment, no mistake has been made. The petitioners have lost nothing, and suffered no injustice in consequence of an imperfect presentation of their case. If the question now before the court was whether or not the receiver should be directed to perform these contracts, I think it would still be the duty of the court, even on the evidence as it now stands, to give the receiver the same direction that it did on the original application. Unless the petitioners have shown that completed, binding contracts existed between Receiver Lathrop and themselves at the time of his death, they have no case. The burden is on them. The papers they produce as evidence of the con-

tracts, when carefully examined, tend rather to show that no contracts were made than that there were made. These papers show that it was the uniform practice of Receiver Lathrop, in dealing with the petitioners, to issue orders for all the material required, except cross-ties, without stating a price, and for all material, cross-ties included, without designating a time when delivery should be made. These omissions, according to the evidence of the petitioners, were not the result of accident or mistake, nor were they made because no agreement as to price and time of delivery existed. Mr. Vanderbilt testifies that the price was always agreed upon before the order was issued, and both petitioners, by their petition, say that during their transactions with Receiver Lathrop their principal contracts with him were made during the months of December and January, and that such contracts were based on estimates previously made by the receiver's subordinates as to the quantity and kinds of material which would probably be needed during the ensuing year. So that it appears that there was a clear understanding between Receiver Lathrop and the petitioners, in every instance, both as to price and the time within which delivery should be made, yet, when the petitioners get an order from the purchasing agent, they take a paper which omits both price and time of delivery. If the orders were drawn pursuant to completed contracts, by which it was understood both parties should be bound, the conduct of the purchasing agent and of the petitioners is both inexplicable and indefensible.

The manner in which the orders were obtained, as the petitioners themselves describe it, was this: they would go to the receiver and make a contract by which they became bound to deliver a certain quantity of material of a particular kind, for a specific price, within a limited period ; the receiver would then, either in person or through the petitioners, direct his purchasing agent to issue an order, and the purchasing agent would issue an order designating merely the quantity and quality of the material, but omitting the price and time of delivery, so that, if the orders were intended as written contracts we have this extraordinary state of affairs—the receiver makes a contract verbally,

which is certain and definite in all its material parts, and such as will enable him, if performed, to get the material he needs by the time it is required for a price he deems reasonable, yet, when the contract comes to be written out and put in such form that it may be preserved, only that part of it which the receiver is to perform is reduced to writing; the other part—that which the petitioners are to perform—is omitted. So that it would seem, if the orders were understood to be completed contracts, that the receiver was willing, after having made a bargain verbally, which bound both the petitioners and himself, to bind himself to its performance, but to leave the petitioners unbound. It would be very difficult for me to believe, even under a much stronger weight of evidence than that which exists in this case, that any business man of ordinary experience and prudence would, in matters of such importance and magnitude, where his conduct was constantly subject to inspection and criticism, deal so stupidly and negligently; but when it is remembered that Receiver Lathrop was a gentleman of very great experience in business affairs and highly distinguished for sagacity and prudence, the claim that he conducted himself in a manner so wantonly careless in the management of this trust exceeds the limits of a rational credulity. Why, contracts in this form placed the receiver in a much worse position than if he had made no contract at all. If he had made no contracts he would have been at liberty to procure the material he needed from any one from whom it could be obtained; but, as it was, he was obliged to take it from the petitioners if they chose to deliver it, and they might deliver it when they saw fit. So that with the contract outstanding there was always danger, if he obtained material from others, that the trust would be burdened with twice as much material as was needed. These, with other considerations, which it is not necessary to mention, have produced a very strong conviction in my mind that the orders were not, at the time they were issued, understood by either party to be completed, binding contracts. I have already said, in the previous case, that the more reasonable theory respecting them is that they were simply issued as notifications to the petitioners of what material would probably be needed by

the road in the future, to afford them an opportunity to make such preparations to furnish it, in case it should be required, as they should deem safe and prudent, but they were under no obligation to furnish it in any event, nor the receiver to take it, unless he gave a further special order designating the price and the time when delivery must be made. *Lehigh Coal and Navigation Co. v. Central R. R. Co. of N. J., 8 Stew. Eq. 426.* This, I still believe, after a most patient and careful consideration of the whole case, to have been the understanding under which the orders were issued. Indeed, it is my duty to state that my conviction that the orders were not intended or understood by either party to be completed, binding contracts, is stronger now than it was when judgment was pronounced on the previous application.

But suppose we assume that Receiver Lathrop designedly issued these orders, in the form in which they were issued, for the purpose of placing the petitioners, in respect to this trust, just in the position that they now claim they occupy, will that better their position, or give them the least particle of right to either specific performance or damages? They knew they were dealing with a person occupying a fiduciary position, whose duty required him to guard the interests of his *cestuis que trust* with the utmost care, and who could not, by a violation of his duty, create any rights or liabilities against the trust. They knew that if he failed in his duty, either through negligence or from actual fraudulent design, he would be guilty of a breach of trust, and that a trustee cannot create rights against the trust property by his perfidy. If they wanted all the chances of advantage which one dealer may rightfully take of another, where each deals in his own individual right and for his own benefit, they should have declined to deal with the receiver, as receiver, and required him to bind himself in his individual capacity; but, having dealt with him in his character as trustee, they can claim no rights or advantages against the trust property which they must trace through a violation of his duty which they assisted him in committing. The rule is settled that a court of equity will in no case enforce the specific performance of a contract made by a trustee in breach of his trust. *Lewin on Trusts 389 ;*

*Fry on Spec. Perf. 114; Waterman on Spec. Perf.* § *164; Mortlock* v. *Buller, 10 Ves. 292; Osgood* v. *Franklin, 2 Johns. Ch. 24.* Sir John Leach, in *Ord* v. *Noel, 5 Madd. 438,* said that if a trustee fails in reasonable diligence, if he contracts under circumstances of haste and improvidence, or if he so acts as to advance the particular purposes of one party interested in the execution of the trust at the expense of another party, a court of equity will not enforce the contract, though the conduct of the party asking its enforcement may have been entirely fair. And in *Goodwin* v. *Fielding, 4 De G., M. & G. 90,* Lord Justice Knight Bruce said that where the question is whether a contract made by a trustee shall be specifically performed or not, different rules must be applied in its solution from those which would be applied to a case where the contract is made by a vendor in his own individual right; and that if it appears that the trustee, in making the contract, conducted the transaction in an unbusinesslike way, to the prejudice of his *cestuis que trust,* specific performance may be refused. The rule is a wise one. Trustees do not act, when dealing with the interests committed to their charge, under the spur of a personal, selfish interest; *cestuis que trust* have no such protection; their security depends, in most instances, almost entirely upon the fidelity of their trustees, and if it were possible for trustees to create rights against their *cestuis que trust* by violating their duty, it is easy to see what would be the consequence—*cestuis que trust* would be plundered by frauds so cunningly executed as to be beyond the reach of the law. There can be no doubt that if Receiver Lathrop dealt with the petitioners in the manner that they say he did, that every time that he directed that an order be issued to them, he committed a breach of his duty, and that they knew it.

Thus far, the case has been considered as though the petitioners were competent to speak as witnesses as to their transactions with Receiver Lathrop. They have both testified, under objection, to such of their dealings with him as are involved in this controversy. His lips are sealed by death. He can neither deny nor explain anything they have said. They gave their testimony without fear of contradiction from him. By a statute enacted

Lehigh Coal and Navigation Co. *v.* Central Railroad Co.

in 1880, the parties to any civil cause, although one or the other sues or defends in a representative capacity, are made competent witnesses in their own behalf, but the statute adds, by way of proviso, that the right thus conferred " shall not extend so as to permit testimony to be given as to any transaction with, or statement by, any testator or intestate represented in said action." *P. L. of 1880 p. 52.* It must be admitted, I think, that if we look simply at the words of exclusion used by the legislature, this case does not come within the statute. Neither party to this proceeding represents either a testator or intestate. If, however, the petitioners were, here or in any other tribunal, seeking a remedy on these orders against the estate of the person who issued them; if their suit was against the executor or administrator of Receiver Lathrop, their mouths would be closed. The statute could then, unquestionably, deprive them of the right to give in evidence, by their own mouths, anything that they had said to Receiver Lathrop, or that he had said to them. The object the legislature had in view in the enactment of this statute is perfectly obvious. It was to prevent the danger which would almost necessarily arise from perjury, or from the suppression of material facts, or from forgetfulness, if the living party to a transaction, where one was dead, was allowed to testify concerning it in a suit by or against the representative of the other. The legislative policy on this subject I have always supposed to be free from doubt, and to be this: that where a transaction is put in contest in the courts, and the truth concerning it can only be ascertained by the evidence of witnesses, and one of the parties to the transaction is prevented by death or legal disability from testifying respecting it, the evidence of the other should, in order to guard against the injustice which would arise from a want of mutuality in the exercise of the right to testify, be also excluded. This policy is unquestionably expressed with sufficient clearness and certainty to make it effectual in at least two cases—first, where one of the parties to the suit " is prohibited by any legal disability from being sworn as a witness (*Rev. p. 378 § 3*); and second, where one of the parties to the action represents a testator or intestate. And I

regard it as also entirely clear that this case is infected, in the most palpable manner, with the very mischief which it was the intention of the legislature to remedy and prevent; but while this is so, it must be conceded that the evidence of the petitioners does not fall plainly within the prohibitory words of either statute, and it has therefore been twice held, first by the supreme court and subsequently by the court of errors and appeals, that where neither party to the action represents a testator or intestate, although one of the parties to the transaction out of which the suit grows is dead, the living party is competent to speak as a witness as to what was said and done by the other. *Hodge* v. *Coriell, 15 Vr. 456 ; Palmateer* v. *Tilton, 13 Stew. Eq. 555.*

It is authoritatively settled that the petitioners are competent to speak as witnesses as to what transpired between Receiver Lathrop and themselves. But it is obvious that their position in the case makes it the duty of the court to examine their testimony with a jealous care, and to scan it with a watchful scrutiny. They are masters of the situation, and swear without fear of contradiction. An honest witness possessing an unusually sensitive conscience, thus situated, would be much less likely to carefully explore his memory to recall those parts of the transaction under investigation which made against his view of his rights, than if he knew he was to be confronted by the evidence of the person standing opposed to him in interest. Self-interest is a great help to the memory. Men usually remember the things which make in their favor a great deal better than they do those which make against them. The safe administration of justice demands that in such a case there should be either satisfactory corroborative evidence, or that the evidence of the living party should be so full and convincing as to persuade the court of its entire truth. The evidence of the petitioners does not, in my judgment, come up to this standard.

After the most thorough consideration which it is possible for me to give the case, my judgment makes it my duty to declare that whether the orders were issued as contracts or not, the petitioners have no right to relief in equity for any loss which they may have sustained by their non-performance, and conse-

quently that they are not entitled to a remedy here or elsewhere for the recovery of such damages.

The petitioners make three additional claims : first, for commissions for purchasing for Receiver Lathrop, at Fredericksburg, Virginia, about forty thousand ties ; second, for interest on the value of material delivered, for which bills were presented and regularly certified to be correct, but which were not paid when payment was demanded, nor until long afterwards ; and third, for material delivered and accepted by Receiver Little, but which has not been paid for.  Each of these claims has been carefully examined, but in disposing of them I shall do little more than state my conclusions.

The proof in support of the claim for commissions is not sufficient to justify its allowance.  The petitioners claim that they purchased the ties as the agents of Receiver Lathrop, under an understanding that they were to be paid a commission of five cents a tie for their services.  But the most weighty proofs in the case show that they acted as principals in the transaction, and not as agents.  The bills they presented for the ties were made out in their own names as vendors, and stated that the ties were delivered in fulfillment of orders issued to them as vendors. Indeed, all the papers made by the petitioners respecting the ties represented them as the vendors and Receiver Lathrop as purchasing of them, and not as a third person.  It is impossible, therefore, to give the petitioners the character they claim in this transaction, without treating every one of their recorded acts, which they themselves put in writing, as delusive and false. Their recorded acts, which they themselves put in writing, tell one story, and they now with their lips tell another and entirely different story.  Both cannot be true.  The papers are the most trustworthy, and must be accepted as expressing the truth. The claim must be disallowed.

To understand the claim for interest, it is necessary to describe briefly how debts contracted by the receiver are collected.  Immediately after delivery is made, a bill is made out showing the quantity of the material delivered and its price.  The bill, together with the certificate of the person to whom delivery has

been made, is then sent to the purchasing agent, who examines it, and if he finds it correct he so certifies, and forwards it to the general superintendent, whose duty it is to ascertain whether or not the material is needed, and, if it is, to so certify, and then send the bill to the auditor, who, on the receipt of the bill thus authenticated, issues a voucher for its payment, and, on the presentation of this voucher to the treasurer, payment is made. Now, the petitioners say that in a number of instances, payment of their bills was delayed or refused by Receiver Little after a voucher had been issued to them, and after they had demanded payment, for periods varying from about two months to nearly a year. This appears to be the fact. The petitioners became entitled to payment on the issuance of a voucher; their debt then became due, and if it was not paid, it, of course, according to the general rule, carried interest like any other debt. Interest will be allowed on the claims specified in the bill of particulars from the time the vouchers were respectively presented for payment until they were paid. The view I have taken of the case does not make it necessary for me to express an opinion as to the effect of the settlement or compromise alleged to have been consummated on the 23d of February, 1883, further than to say that the petitioners did or said nothing in that matter which, in my judgment, should be held to bar or impair their right to interest.

The petitioners also claim that they have delivered to Receiver Little material of the value of $17,331.16, which has been accepted, but not paid for. I have already decided, and so announced to counsel, that of this sum the petitioners are entitled to be paid $16,357.33, leaving undetermined a claim for $973.33. My further examination of this claim has resulted in a conviction that it should be allowed. The proofs in support of it are not strong nor entirely satisfactory, but sufficient, I think, to make it my duty to allow it.

A counter-claim is made by Receiver Little against the petitioners. He charges that the petitioners, in making collections of Receiver Lathrop, for material delivered, have, in many instances, received more than they were entitled to, either by

charging more for the material than the price agreed upon, or by charging, where no price was agreed upon, more than the customary market rates.   The attempt is to overhaul and challenge all the petitioners' transactions with Receiver Lathrop.   In view of the scrutiny which a claim had to undergo before it was in condition to be presented for payment, it would seem to be impossible that errors of the kind indicated could creep into the bills of the petitioners without the fraudulent connivance of more than one of the receiver's employees.   The evidence will not justify a conclusion that there has been such connivance. Errors to the amount of $106.17 are admitted.   The petitioners, in addition, admit that they have in their hands $27 which they received from Receiver Lathrop, and which has not been credited on any of their claims.   A set-off of $133.17 will be allowed. The balance of the receiver's counter-claim must be disallowed.